IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Sharon Floyd, )<br>          Plaintiff, )<br>                    )<br>     vs. )<br>                    )<br>Jo Anne B. Barnhart, )<br>Commissioner of Social Security, )<br>                    )<br>          Defendant. )<br>_____ ) | Civil Action No. 6:05-3009-RBH-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

       This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

       The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income (SSI) benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

       The plaintiff filed her application SSI benefits on July 25, 2003 (protective filing date June 13, 2003), alleging that she became unable to work on December 1, 2002. The application was denied initially and on reconsideration by the Social Security Administration. On May 4, 2004, the plaintiff requested a hearing. The administrative law judge, before

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

whom the plaintiff and her attorney appeared, considered the case *de novo*, and on May 27, 2005, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on August 22, 2005. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

(1)    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

(2)    The claimant's degenerative disc disease is considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(e).

(3)    This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart F, Regulation No. 4.

(4)    The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

(5)    The claimant retains a residual functional capacity to perform the full range of sedentary work activity.

(6)    The claimant is unable to perform any of her past relevant work (20 CFR § 416.965).

(7)    The claimant is a "younger individual" (20 CFR § 416.963).

(8)    The claimant has a "high school (or high school equivalent) education" (20 CFR § 416.964).

(9)    The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 416.968).

(10)    The claimant has the residual functional capacity to perform the full range of sedentary work (20 CFR § 416.967).

(11)    Based on an exertional capacity for sedentary work, and the claimant's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 201.21.

(12)    The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."   42 U.S.C. §423(a).   "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled

3

at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct

a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 38 years old when she filed her SSI application and 40 years old as of the date of the ALJ's decision (Tr. 60). She has a high school education and has worked in the vocationally relevant past as an assembly worker, health/beauty associate, mail handler, retail sales associate, and resort steward (Tr. 64, 69).

On December 22, 2002, the plaintiff received emergency treatment for low back pain that began one week earlier. She said she had been moving furniture when the injury occurred. The attending physician prescribed analgesic and anti-inflammatory medications (Tr. 101-05). The plaintiff subsequently saw a chiropractor for three visits (Tr. 106-112).

On January 28, 2003, the plaintiff presented to orthopedist Dr. James C. McIntosh for evaluation of back pain and right buttock pain. On examination, she had near normal lumbar range of motion, and normal motor strength and sensation. A straight leg raising test did not produce any signs of sciatic tension. Dr. McIntosh recommended a home exercise program (Tr. 177).

On May 27, 2003, the plaintiff presented to Dr. McIntosh's associate, orthopedist Dr. James K. Aymond, and reported recurrent left-sided low back pain and left buttock and leg pain. On examination, she had limited mobility of the lumbar spine

secondary to guarding.  Her reflexes and sensation were unremarkable.  A straight leg raising test on the left produced left buttock and thigh discomfort.  Dr. Aymond assessed left-sided sciatica and prescribed pain medication (Tr. 176).

At a follow-up visit on June 12, 2003, Dr. Aymond noted an MRI showed a left paracentral disc protrusion with contact and displacement of the S1 nerve root and slight migration of the disc material.  He recommended a lumbar epidural steroid injection (Tr. 175).

On August 12, 2003, Dr. Aymond noted that the plaintiff never had the epidural steroid injection, and that she continued to have back and left leg pain.  A straight leg raising test was positive on the left, but her neurological examination was otherwise normal.  The plaintiff indicated she would notify Dr. Aymond if she elected to have the injection (Tr. 174).

On August 20, 2003, the plaintiff presented to Dr. Andrew Geer for evaluation of her back pain.  She reported worsening symptoms, headaches and mild depression.  On examination, her sensation and motor strength were normal, as were her affect and memory.  Straight leg raising was positive for pain on the left, and otherwise normal.  Dr. Geer assessed lumbar radiculopathy and administered an epidural steroid injection.  The plaintiff reported almost complete pain relief after the injection (Tr. 239-40).  Two weeks later, she received another epidural steroid injection from Dr. Geer (Tr. 221).

On September 30, 2003, the plaintiff presented to family practitioner Dr. Harold Nazon for treatment of hypertension.  Dr. Nazon noted that her hypertension was relieved by medication compliance and aggravated by noncompliance.  The plaintiff specifically denied having back pain, muscle pain, numbness, tingling, depression, anxiety, nausea, palpitations, or dizziness.  Her blood pressure was 144/80 initially, and 120/80 to 120/88 on retakes.  She demonstrated a normal gait, balance, motor strength, sensation,

and reflexes.   She was also alert and fully oriented.   Dr. Nazon assessed benign hypertension (Tr. 187-88).

At a follow-up visit with Dr. Nazon on October 13, 2003, the plaintiff reported muscle cramps, but denied any dizziness or other hypertension symptoms.  She said she "forgot to mention" at her last visit that she had been having chronic low back pain and had received three epidural steroid injections with minimal improvement, and that she was contemplating surgery.[2]   On examination, her blood pressure was 148/80.   Dr. Nazon assessed low potassium, anemia, low back pain, hyperglycemia, a drug reaction, and uncontrolled hypertension.  He directed the plaintiff to comply with medication, reduce her salt intake, and check her blood pressure (Tr. 185-86).

On October 16, 2003, the plaintiff underwent a left L5 hemilaminectomy and an L5-S1 diskectomy on the left.  On discharge, she was told not to drive until cleared by her physician, and not to lift anything greater than 15 pounds.  Her condition at discharge was "excellent" (Tr. 116-59).

At a postoperative follow-up visit a few weeks after surgery, Dr. Aymond noted that the plaintiff was doing "quite well with less lower back discomfort."  He indicated she was still having some tingling in the left buttock, but that it had improved significantly (Tr. 171).

On November 24, 2003, the plaintiff returned to Dr. Nazon.  She denied having any side effects or muscle cramps, and said her blood pressure was under good control while she was hospitalized.  She reported chronic back pain, but denied any other symptoms.   On examination, her blood pressure was 142/84.   Dr. Nazon found her

---

[2]It is unclear when Dr. Aymond recommended back surgery, since the record does not contain any of his treatment notes dated between August 2003, when surgery was not discussed, and October 2003, when he performed the surgery.

hypertension and back pain were unchanged, her low potassium had improved, and her hyperglycemia and drug reaction had resolved (Tr. 183-84).

On December 7, 2003, a State agency physician reviewed the plaintiff's records and assessed her physical RFC as it was projected to be in October 2004, 12 months after the surgery. The physician found the plaintiff could lift 20 pounds occasionally and 10 pounds frequently, stand or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. The physician also found the plaintiff could never climb ladders, ropes or scaffolds, but that she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl (Tr. 162-69).

On December 12, 2003, Dr. Aymond noted that the plaintiff was making progress, although she had some residual left buttock pain. He found her range of motion had greatly improved, and prescribed medication for nerve pain and a home exercise program (Tr. 171).

On January 6, 2004, the plaintiff told Dr. Aymond that she continued to have left buttock and thigh pain, and some radiating pain below the knee. A straight leg raising test was mildly positive on the left. A subsequent MRI showed minimal residual disc bulging centrally, a moderate amount of fibrosis, and no evidence of a herniated disc (Tr. 170-71, 259).

On January 26, 2004, the plaintiff told Dr. Nazon her hypertension was improving. Dr. Nazon found it was relieved with medication compliance aggravated by poor diet and noncompliance. The plaintiff denied having any hypertensive symptoms, but said her back pain still bothered her. On examination, her blood pressure was 150/94 initially, and 132/80 on retake. Dr. Nazon noted the hypertension was improving (Tr. 181-82).

The plaintiff received emergency treatment for a rapid heartbeat on February 24, 2004. Her blood pressure was 156/61. The attending physician diagnosed a fever and anxiety (Tr. 214-15).

8

On April 6, 2004, a State agency physician reviewed the plaintiff's records and assessed her current RFC. The physician found she could lift 20 pounds occasionally and 10 pounds frequently, stand about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. The physician found she could occasionally climb, balance, stoop, kneel, crouch, and crawl (Tr. 195-97).

On April 22, 2004, the plaintiff presented to family practitioner Dr. Betty Obong to establish a primary care relationship. She reported ongoing back pain, poor sleep, bad "nerves," thoughts of dying, depression, and a fast heart rate. Dr. Obong assessed severe depression and prescribed medications for depression and anxiety (Tr. 205-06).

At a follow-up visit on May 18, 2004, the plaintiff said she felt better on her anxiety medication, and that she was using her antidepressant medication less than three times per week because she was concerned about possible weight gain. She reported having panic episodes. On examination, her blood pressure was 130/72. Dr. Obong assessed panic attacks and depression, and adjusted her medications. She also subsequently diagnosed migraines (Tr. 20-042).

On September 27, 2004, the plaintiff returned to Dr. Geer for a consultation regarding her back pain. She walked with a cane, but was not interested in an injection. Dr. Geer agreed with Dr. Aymond that further surgery was unnecessary. He suggested she get counseling, since she appeared depressed and distressed (Tr. 208, 210).

On October 4, 2004, the plaintiff returned to Dr. Geer and requested an epidural injection, which he provided. The plaintiff reported modest improvement (Tr. 207).

An MRI of the lumbar spine performed on October 21, 2004, showed mild degenerative disc disease at L5-S1 with evidence of prior surgery and epidural scarring, and radiculitis of the left S1 nerve root. There was no recurrent disc herniation. The radiologist noted that the plaintiff complained of right sciatica, but there was no evidence of right-sided pathology (Tr. 257).

9

On November 4, 2004, Dr. Obong completed a Medical Source Statement and opined that during an eight-hour day, the plaintiff could sit for zero hours, stand for one hour, walk for one hour, and work for one hour. On the next page, she opined that the plaintiff could sit for 30 minutes at a time and not stand for any time before changing positions. She also opined that the plaintiff could occasionally lift and carry up to 10 pounds. She opined that the plaintiff could use her hands for repetitive actions. Dr. Obong further opined that she could occasionally climb, reach, crouch, and kneel, and never bend, squat, crawl, or stoop. She opined that the plaintiff would be absent more than three times per month. Dr. Obong concluded that the plaintiff was "unable to work at this time" (Tr. 261-64).

On June 23, 2005, Dr. Obong wrote a "To Whom it May Concern" letter, indicating that the plaintiff was unable to stand more than two hours and could not stoop or bend repeatedly. She further opined that the plaintiff had an anxiety disorder that would interfere with her ability to focus and concentrate, and poor interpersonal skills. She opined that the plaintiff could not be gainfully employed (Tr. 265).

In questionnaires submitted in connection with her application for benefits, the plaintiff reported that she had difficulty getting out of bed, putting on her socks and shoes, tying her shoelaces, doing laundry, doing housework, and lifting objects (Tr. 88, 96). She indicated that she could "hardly walk," and that she could not sit for long periods of time or drive long distances due to pain (Tr. 92, 96). The plaintiff also reported:

> I just want you to know that I do have a disable[d] son at home that needs help around the clock[.] [I]n the past I had to stay home and take care of my son and still is now (sic). I don't have any family member to help me with my son[.] [I]t is very hard because I am very stress[ed] and suffering from depression because of my back condition and other stressful problem[s].

(Tr. 97).

10

At the administrative hearing, the plaintiff said her pain worsened after surgery, and that she walked with a cane ( Tr. 30). She indicated that her children helped her around the house (Tr. 30-31). The plaintiff said injections did not alleviate her pain, but that her oral analgesic helped "as long as [she] ke[pt] taking it" (Tr. 32). She reported medication side effects, including lightheadedness, nausea, and dizziness (Tr. 32). She said she felt depressed and anxious, and that she had panic attacks three times per week that occurred when she was around people or in stressful situations (Tr. 34-35). The plaintiff testified that she could stand for 30 minutes to an hour at a time and sit for 30 minutes at a time (Tr. 36). She said she could not sit long enough to do a desk job (Tr. 36-37).

## ANALYSIS

As set forth above, the ALJ found that the plaintiff could perform a full range of sedentary work. The plaintiff alleges that the ALJ erred by (1) failing to explain why the plaintiff's spinal impairment did not meet the level of Listing 1.04A Disorders of the Spine: (2) failing to properly evaluate the opinion of her treating physician; (3) failing to properly evaluate her subjective complaints of pain; and (4) failing to obtain the opinion of a vocational expert.

### *Listing 1.04A*

The ALJ found that the plaintiff suffered from severe degenerative disc disease (Tr. 19). The ALJ further found that the plaintiff did not meet a listing and stated:

> Specific consideration has been given to Listing 1.00. In reaching this conclusion, the Administrative Law Judge has considered the opinions of the Disability Determination Service's (DDS) medical consultants, who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion.

11

(Tr. 20).  The plaintiff first argues that the ALJ failed to explain why her spinal impairment did not meet the level of Listing 1.04A Disorders of the Spine.  The plaintiff cites *Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986) in support of her argument.  In *Cook*, the court determined that in cases where there is ample factual support in the record for a particular listing, the ALJ must provide a full listing analysis.  *Id.* at 1172-73.  The court further stated, "Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination."  *Id.* at 1173.

The defendant argues that the plaintiff has not shown that she has the level of functional loss required to meet Listing 1.04.  Specifically, the defendant argues that the plaintiff does not have an inability to ambulate effectively or an inability to perform fine and gross movements (def. m.s.j. 10-11).  However, as noted by the plaintiff in her reply brief, the defendant's *post hoc* rationalizations are insufficient.  *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").  *See also Cunningham v. Harris*, 658 F.2d 239, 244 n.3 (4th Cir. 1981) ("We cannot affirm the decision of the Secretary on grounds not invoked by the agency.").  The ALJ failed to provide an adequate analysis of why the plaintiff's impairments did not meeting the listing.  Accordingly, upon remand, the ALJ should be instructed to explain why the plaintiff does not meet Listing 1.04A.

### *Treating Physician*

The plaintiff next argues that the ALJ failed to properly consider the opinion of Dr. Betty Obong, the plaintiff's treating physician.  On November 4, 2004, Dr. Obong completed a Medical Source Statement and opined that during an eight-hour day, the plaintiff could sit for zero hours, stand for one hour, walk for one hour, and work for one hour.  On the next page, she opined that the plaintiff could sit for 30 minutes at a time and

not stand for any time before changing positions. She also opined that the plaintiff could occasionally lift and carry up to 10 pounds. She opined that the plaintiff could use her hands for repetitive actions. Dr. Obong further opined that she could occasionally climb, reach, crouch, and kneel, and never bend, squat, crawl, or stoop. She opined that the plaintiff would be absent more than three times per month. Dr. Obong concluded that the plaintiff was "unable to work at this time" (Tr. 261-64).

On June 23, 2005, Dr. Obong wrote a "To Whom it May Concern" letter, indicating that the plaintiff was unable to stand more than two hours and could not stoop or bend repeatedly. She further opined that the plaintiff had an anxiety disorder that would interfere with her ability to focus and concentrate and poor interpersonal skills. She opined that the plaintiff could not be gainfully employed (Tr. 265).

The ALJ accorded Dr. Obong's opinion "minimal weight as it is generally unsupported by the weight of the objective medical evidence of record" (Tr. 21). Specifically, the ALJ noted that the plaintiff improved following her back surgery and treatment with mental health medications. The ALJ further stated that Dr. Obong is a family physician who treated the plaintiff on a limited basis primarily for hypertension and, to a lesser extent, her mental health. The ALJ also accorded the opinions of the state agency consultants little weight, stating that the consultants' limitation of the plaintiff to light work was overly expansive and that the occasional postural limitations placed on the plaintiff were not supported by the medical evidence (Tr. 21).

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the

13

Commissioner's determination.  SSR 96-2p.  Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician opinion by applying five factors:  (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion.  20 C.F.R. §404.1527(d)(2)-(5).  Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion.  SSR 96-2p, 1996 WL 374188, *5.  As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

The defendant argues that Dr. Obong's findings were not supported by the objective medical findings and the evidence showing improvement in the plaintiff's condition with surgery and epidural steroid injections.  The defendant cites medical evidence from the

14

record in support of the argument and further argues that Dr. Obong's opinions were internally inconsistent.

The ALJ erred by not providing the reasoning for his decision rejecting Dr. Obong's decision, including any medical evidence contradicting the opinion. Again, as argued by the plaintiff, the defendant's *post hoc* rationalizations are insufficient. Upon remand, the ALJ should be instructed to evaluate the opinion of Dr. Obong in accordance with the above-cited law.

### Subjective Complaints

The plaintiff next argues that the ALJ failed to conduct a proper credibility analysis. A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

15

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ found that the plaintiff's allegations "have been inconsistent with the medical evidence of record, the [plaintiff's] reports to her physicians, and the treatment sought and received" (Tr. 19).  The ALJ went on to note that the plaintiff's testimony as to her limitations was much more severe than what she described to her doctors.  He further noted that the plaintiff admitted that she did not always take her anti-hypertensive medications as directed and that she did not initially take the Paxil prescribed for her mental condition as prescribed because of concerns about weight gain.  Further, while the plaintiff complained at the hearing of side effects from her medication, she denied such side effects to her treating physicians.  Lastly, the ALJ noted that the medical evidence failed to support the plaintiff's assertions regarding the frequency of her panic attacks.

The plaintiff argues that the ALJ bypassed the threshold question of whether the claimant's impairment could reasonable cause the type and degree of pain alleged and proceeded directly to a credibility analysis. This court agrees. Accordingly, the case should be remanded to the ALJ for consideration of whether the plaintiff has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain he alleges.  *See Craig*, 76 F.3d at 596 ("In the instant case, the ALJ did not expressly

16

consider the threshold question of whether Craig had demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain she alleges. Instead, the ALJ proceeded directly to considering the credibility of her subjective allegations of pain. Accordingly, we remand to the ALJ to determine whether Craig has an objectively identifiable medical impairment that could reasonably cause the pain of which she complains. If the ALJ concludes that she does, then, and only then, should it undertake an assessment into the credibility of Craig's subjective claims of pain."). If the ALJ determines that the plaintiff does have such an impairment, the ALJ should then assess her credibility.

### Vocational Expert

Lastly, the plaintiff argues that she suffers from both exertional and nonexertional impairments and, thus, the ALJ should have obtained vocational expert testimony rather than relying solely on the Medical Vocational Guidelines ("the Grids") to satisfy the Commissioner's burden of identifying jobs in the national economy that the plaintiff can perform. *Heckler v. Campbell*, 461 U.S. 458 (1983); *Walker v. Bowen*, 889 F.2d 47 (4th Cir. 1989). When a claimant suffers from both exertional and nonexertional limitations, the grid tables are not conclusive but may serve as guidelines. *Wilson v. Heckler*, 743 F.2d 218, 222 (4th Cir. 1984). The Fourth Circuit has recognized that "not every nonexertional limitation or malady rises to the level of a nonexertional impairment, so as to preclude reliance on the grids." *Walker*, 889 F.2d at 49. The proper inquiry in such a case is "whether the nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable." *Id.* If a nonexertional condition reduces an individual's residual functional capacity to perform sedentary work, it is inappropriate to apply the grids. The question of whether a nonexertional condition

17

interferes with a claimant's residual functional capacity to perform certain jobs is a question of fact. *Smith v. Schweiker*, 719 F.2d 723 (4th Cir. 1984).

Here, the plaintiff contends that she had "severe" nonexertional impairments – dizziness, lightheadedness, and stomach upset caused by her medication, pain, and mental impairments – that would preclude the use of the Grids. While the plaintiff complained at the hearing of side effects from her medication, she denied such side effects to her treating physicians. However, substantial evidence does not support the ALJ's conclusion that the plaintiff's chronic back pain and depression would not reduce her residual functional capacity to perform sedentary work. Accordingly, upon remand, the ALJ should obtain vocational expert testimony.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.


s/William M. Catoe
United States Magistrate Judge

August 10, 2006

Greenville, South Carolina

18